**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FMG EXPRESS FACILITY MANAGEMENT GROUP LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| vs. | :    **CASE No. _____** |
| | : |
| TRIPLETT CONTRACTING LLC; and TIMOUR TRIPLETT, | :    **CIVIL ACTION** |
| | : |
| Defendants. | : |
| | : |

## **COMPLAINT**

Plaintiff, FMG Express Facility Management Group LLC ("Plaintiff" or "EFM"), by and through its undersigned attorneys, Royer Cooper Cohen Braunfeld LLC, files this Civil Action Complaint (this "Complaint") against Defendants, Triplett Contracting LLC ("Triplett Contracting") and Timour Triplett ("Mr. Triplett," and collectively with Triplett Contracting, "Triplett" or "Defendants"),[1] and avers as follows:

## **INTRODUCTION**

1.      This action (this "Action") involves a textbook example of over-promising and under-delivering.  Or, more accurately, over-promising and not delivering at all.  Triplett's promises were many and impressive, but their follow-through was virtually nonexistent.  Hired by EFM to provide snow removal services for large corporate accounts, Triplett Contracting failed in every respect, starting with the very first severe snow of the season and continuing for each successive storm.  The promised equipment was never in place, the promised legion of "in house" crews ended up being a patchwork of subcontractors that failed to show up, and the promised

---

[1] EFM, Triplett Contracting, and/or Mr. Triplett are each individually referred to herein as a "Party" and collectively, as the "Parties."

technical expertise with snow removal became demonstrated ignorance when it came to preparing for and responding to storms.  All of these unfulfilled promises, combined with Triplett's outrageous behavior after being confronted about their failures, have substantially damaged, and continue to damage, EFM's business.  This Action is brought to enjoin Triplett's tortious behavior, to force them to specifically perform under the operative contractual documents, and for EFM to recover for its substantial business losses.

## PARTIES

2.    EFM is a limited liability company formed under the laws of the State of Texas, with its principal place of business located at 3902 East University Drive, Phoenix, Arizona 85034.

3.    EFM has one (1) member, Mr. Frances M. Portugal, who is an individual resident of the State of Arizona.

4.    Triplett Contracting is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 2412 South 5th Street, Philadelphia, PA 19148.

5.    Upon information and belief, Triplett Contracting has one (1) member, Mr. Triplett, who is an individual resident of the Commonwealth of Pennsylvania.

6.    Upon information and belief, Mr. Triplett is the managing member of Triplett Contracting.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332(a) because: (i) EFM is deemed a citizen of the State of Arizona, Triplett Contracting is deemed a citizen of the Commonwealth of Pennsylvania, and Mr. Triplett is a citizen of the Commonwealth of Pennsylvania, such that EFM and Triplett are completely diverse from one

another; and (ii) in light of Triplett's conduct as set forth in this Complaint below, EFM seeks in excess of $75,000 in damages, exclusive of interests and costs, in an amount to be fully determined at trial.

8.     This Court has personal jurisdiction over Triplett Contracting because, *inter alia*, Triplett Contracting consented to and waived any right to object to this Court's personal jurisdiction, as set forth in Section R.3 of EFM's Terms and Conditions (as defined in this Complaint below) that are incorporated by reference into the Agreement (as defined in this Complaint below) at the center of this dispute, which states:

> Governing Law and Jurisdiction.   This Agreement shall be construed and governed in accordance with the laws of the State of New York, without regard to conflict of law principles.  The United Nations Convention on Contracts for the International Sale of Goods (CISG) does not apply to this Agreement.  In the event the Parties are unable to mediate their dispute to satisfactory resolution, ***the Parties agree that the applicable state and federal courts located in New York shall have exclusive jurisdiction to hear and determine any claims or disputes between the Parties arising out of or related to this Agreement.  The Parties expressly submit and consent in advance to such jurisdiction in any action or suit commenced in such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue or forum non conveniens***.

*See* Terms & Conditions (as defined in this Complaint below) § R.3 (Emphasis added) (the "Forum Selection Clause").

9.     Similarly, this Court has personal jurisdiction over Mr. Triplett because, *inter alia*, Mr. Triplett is bound by the Forum Selection Clause given that Mr. Triplett is "closely related" to Triplett Contracting insofar as Mr. Triplett (a) had an active role in the transaction(s) between EFM and Triplett Contracting giving rise to this Action; and/or (b) had (and continues to have) an active role in Triplett Contracting with respect to the events giving rise to this Action.

10.     Indeed, this Court's enforcement of the Forum Selection Clause against Mr. Triplett is foreseeable by virtue of the relationship between Triplett Contracting (*i.e.*, the signatory) and Mr. Triplett (*i.e.*, the Party sought to be bound) given that Mr. Triplett is being sued in connection with conduct that he directly participated in, and, in fact, directly spearheaded, on behalf of Triplett Contracting, as further detailed herein below.  *See, e.g., id.*

11.     Venue is proper in this Judicial District pursuant to the Forum Selection Clause.

## FACTUAL BACKGROUND

**I.      Triplett Targets EFM and Pursues a Business Relationship.**

12.     EFM offers its clients a single source solution for facility management.

13.     EFM's integrated facility programs are customized to its clients' buildings and unique needs, offering its clients any combination of one or more of the following services, with a single point of contact, consolidated billing, and consistency in quality execution: commercial cleaning, pest control, ground maintenance (including snow removal), plumbing, electrical, HVAC, and disaster preparedness, among others.

14.     Triplett Contracting is a construction company that, according to its website,[2] *inter alia*, advertises handyman, electrical, plumbing, roofing, painting, trash disposal, kitchen and bath, junk removal, remodeling and renovating, window, commercial, air duct cleaning, landscaping, cleaning, and local moving services, among other services, throughout the United States.

15.     Mr. Triplett is the Founder and Chief Executive Officer of Triplett Contracting and was actively involved and participated directly in the allegations made against Triplett Contracting, detailed herein below.

---

[2] *See* https://www.tripcontracting.com/services

16.     On or about July 5, 2022, Mr. Triplett, on behalf of Triplett Contracting, sent an email to EFM requesting to become one of EFM's facility management suppliers[3] (the "7/5/22 Email").   A true and correct copy of the 7/5/22 Email is attached hereto as **Exhibit 1** and is incorporated by reference as if fully set forth herein.

17.     In the 7/5/22 Email, Mr. Triplett, on behalf of Triplett Contracting, represented to EFM, *inter alia*, that Triplett Contracting has "over 300 in-house technicians that [it] ha[s] spread across all [its] markets." *Id.*

18.     In the 7/5/22 Email, Mr. Triplett, on behalf of Triplett Contracting, also represented to EFM, *inter alia*, that Triplett Contracting has "an entire projects team, able to handle full renovations, build-ups and roll outs for all construction projects." *Id.*

19.     Attached to the 7/5/22 Email (*i.e.*, Exhibit 1) is Triplett Contracting's "Capability Statement," which, along with the body of the 7/5/22 Email, is incorporated by reference as if fully set forth herein.  *Id.*

20.     On or about the same date—July 5, 2022—Mr. Triplett, on behalf of Triplett Contracting, had a telephone call with EFM's Strategic Sourcing and Vendor Management personnel to discuss the 7/5/22 Email, during which Mr. Triplett, on behalf of Triplett Contracting, represented that Triplett Contracting self-performs under its commercial agreements.

21.     EFM relied on these representations and decided to engage Triplett Contracting as one (1) of its facility management suppliers generally on or about July 5, 2022.

22.     Furthermore, the above-stated representations were material insofar as EFM **strongly** desires that its facility management suppliers only utilize their own primary crews in connection with servicing EFM's accounts, if awarded a bid by EFM, to service EFM's clients.

---

[3] EFM's facility management suppliers bid on opportunities to service EFM's client accounts, and if awarded any such bid by EFM, enter into separate service agreements with EFM related to such services and accounts.

23.     It is important that EFM's facility management suppliers only utilize their own primary crews in connection with servicing EFM's clients so that EFM can properly vet them and ensure EFM's clients receive consistent and quality service.

24.     As a result, on or about July 11, 2022, EFM and Triplett Contracting executed a Mutual Confidentiality Agreement (the "NDA"), and EFM subsequently began to onboard Triplett Contracting as one (1) of its facility management suppliers; Mr. Triplett executed the NDA on behalf of Triplett Contracting in his capacity of Chief Executive Officer.

**II.     Carvana Is One of EFM's Key Accounts.**

25.     For approximately five (5) years leading up to the commencement of this Action, Carvana Co. ("Carvana"), an online used car retailer headquartered in Tempe, Arizona, has been one (1) of EFM's key accounts for whom EFM has provided janitorial, pest control, landscaping, and general contractor services, among others.

26.     Notably, EFM previously provided snow removal services for Carvana facilities located throughout the country, but not since in or around the 2018-2019 winter season.[4]

27.     However, in or around September 2022, Carvana provided EFM with a second (2nd) opportunity to place a bid in connection with providing snow removal services on its behalf at certain of Carvana's locations for the 2022-2023 winter season (collectively, the "Carvana Locations").[5]

28.     Upon information and belief, this opportunity arose because the company that had been providing snow removal services on behalf of Carvana since in or around 2019 at these Carvana Locations failed to service them to Carvana's satisfaction.

---

[4] Prior to the 2018-2019 winter season, Carvana engaged a company unaffiliated with EFM to provide snow removal services on Carvana's behalf because said company proposed to perform said services at a lower cost than that which EFM was able to propose at that time.
[5] Carvana utilizes an online platform to list and approve bids.

29.     Importantly, throughout September 2022, Mr. Triplett, on behalf of Triplett Contracting, continued to represent to EFM that it would be able to self-perform when servicing EFM's commercial accounts.

30.     Specifically, on or about September 7, 2022, Mr. Triplett, on behalf of Triplett Contracting, sent an email to EFM stating, *inter alia*, that "95% of [Triplett Contracting's] workers are in house[]" (the "9/7/22 Email").  A true and correct copy of the 9/7/22 Email is attached hereto as **Exhibit 2** and is incorporated by reference as if fully set forth herein.

31.     In the 9/7/22 Email, Mr. Triplett, on behalf of Triplett Contracting, also stated, *inter alia*, that "[t]he only time [Triplett Contracting] subcontract[s] out would be a much more trade intensive project such as a store rewire or a HVAC condenser replacement or anything that typically exceeds $50,000 per project. ***As for landscaping, snow, and parking lot work orders, all those can be handled by [Triplett Contracting's] own crews*.**"  *Id.* (Emphasis Added).

32.     So, EFM relied on the representations made by Mr. Triplett, on behalf of Triplett Contracting, in the 9/5/22 Email and 9/7/22 Email for the reasons aforesaid, and placed the bid with Carvana to provide snow removal services in connection with EFM's Carvana account at the Carvana Locations, with the understanding that Triplett Contracting's services (on behalf of EFM) would be an intricate component of EFM being able to perform consistent and high quality services in connection therewith.

33.     On or about September 29, 2022, Carvana told EFM that it was awarded the bid.

34.     The contract by and between EFM and Carvana contained a one (1) year term, meaning, it only contemplates EFM providing snow removal services at certain Carvana Locations for the 2022-2023 winter season.

35.     However, EFM understood based on conversations with Carvana personnel that if service was consistent and of high quality then the parties anticipated entering into another agreement commencing as of the 2023-2024 winter season for a more prolonged term of three (3) years, consistent with term of EFM's contracts with its other clients on behalf of whom EFM provides facility management services.

## II.     EFM and Triplett Contracting Execute a Letter of Intent to Service EFM's Carvana Account.

36.     Indeed, as the Parties contemplated, on or about October 20, 2022, Triplett Contracting placed a bid with EFM to perform snow removal services in connection with EFM's Carvana account at the Carvana Locations.

37.     On or about October 20, 2022, EFM sent Triplett Contracting a Notice of Intent to Award Letter (the "Award Letter") informing Triplett Contracting that EFM awarded the bid.  A true and correct copy of the Award Letter is attached hereto as **Exhibit 3** and is incorporated by reference as if fully set forth herein.

38.     Specifically, EFM selected Triplett Contracting to provide such snow removal services in consideration of Seven Hundred Twenty Nine Thousand Five Hundred Sixty Two Dollars and Seventy Three Cents ($729,562.73), pending any prorated seasonal adjustments.  *Id.*

39.     Notably, the Award Letter references certain "Action Items" that were discussed and agreed upon during a telephone call between the Parties on or about October 20, 2022, prior to the Award Letter formally being sent to Triplett Contracting by EFM.  *Id.* at p. 2.

40.     Specifically, the Parties agreed, as memorialized in the Award Letter, that Triplett Contracting was to, *inter alia*, complete "site-walks" within ten (10) to twelve (12) days of the date of the Award Letter at the Carvana Locations indicated therein.  *Id.* at pp. 1-2.

41.     The Parties also agreed during the aforesaid call, as memorialized in the Award Letter, that Triplett Contracting was required to, *inter alia*, (a) stage all heavy equipment (and containers for de-icing solutions) at four (4) large inspection centers[6] (the "4 Large ICs") to ensure expeditious mobilization when ordered to perform snow removal services throughout the 2022-2023 winter season; (b) establish communication channels internally, and with EFM, including, but not limited to, Triplett Contracting sharing with EFM its predictive weather software; (c) establish a back-up preparedness plan, including, but not limited to, protocols documented with EFM that would be utilized in the event that a "vehicle breaks down," "someone doesn't show up," and/or a "technician resigns/quits"; and (d) execute contracts for *each* Carvana Location identified therein once the "site-walks" were completed and any issues identified.  *Id.* at p. 2.

42.     The 4 Large ICs referenced in the Award Letter at which Triplett was required to stage all heavy equipment (and containers for de-icing solutions) were as follows:

| Location Name | EFM Location ID |
| --- | --- |
| Delanco IC | NJ2001 |
| Indianapolis IC | IN2001[7] |
| Elyria IC | OH2004 |
| Trenton IC | OH2005 |

[6] As used throughout this Complaint from time to time, the term "IC" or "ICs" stand for "inspection center" and inspection centers, respectively.

[7] The Award Letter indicates that the EFM Location ID (*i.e.*, the internal reference number that EFM uses to identify the locations it services) for the Indianapolis IC is "IN2001." To be clear, the Seasonal Service Agreement (as defined and discussed in this Complaint below) ultimately executed by and between EFM and Triplett Contracting in connection with servicing the Indianapolis IC, inadvertently states that the Location ID for the Indianapolis IC is "IN1004."  *Compare* Exhibit 3, at p. 7 *with*, Exhibit 4, at p. 7 (referencing the Indianapolis IC being located at 6508 W. FW Marks Drive, Greenfield Indiana, with seasonal pricing in the amount of $154,812.00).  Thus, the correct Location ID for this IC is "IN2001," and the inadvertent listing of the Location ID used in the Seasonal Service Agreement for the Indianapolis IC (*i.e.*, Exhibit 4) did not cause any confusion between the Parties at any time relevant to this Action; all Parties understood that any and all such references to "IN2001" was a reference to the Indianapolis IC.

43.     Moreover, the Parties agreed during the aforesaid call, as memorialized in the Award Letter, that Triplett Contracting's service of "seasonal" locations (discussed below) required Triplett Contracting's operational teams to, *inter alia*, manage snow and ice removal for the contract executed in connection with each respective Carvana Location, stating specifically, *inter alia*, as follows: "If it is snowing, they will be pushing.  If an emergent snow storm rolls in, they will be back on site even if they just left."  *See* Award Letter, p. 3.  Furthermore, in connection with "per event" locations (discussed below), the Parties agreed, as memorialized in the Award Letter, that Triplett Contracting's technicians will bring their own equipment on an as needed basis.  *See, e.g., id.*

44.     The Award Letter concluded by reminding (or more accurately, ordering) Triplett to obtain the required financing and bonding to service EFM's Carvana account.  *See, e.g., id.* at 4; *see also e.g.*, Terms & Conditions (as defined below) § N.8.

## III.    EFM and Triplett Contracting Execute Service Agreements To Service The Carvana Locations.

45.     EFM and Triplett ultimately entered into approximately forty-nine (49) snow removal contracts in connection with EFM's obligation to service the Carvana Locations during the 2022-2023 winter season as aforesaid (each, a "Service Agreement," and collectively, the "Service Agreements"), each for separate and distinct good and valuable consideration.[8]

46.     Approximately thirty-one (31) of these Service Agreements obligate Triplett Contracting to provide such services on a "seasonal" basis (each, a "Seasonal Service Agreement," and collectively, the "Seasonal Service Agreements").  A true and correct copy of a representative

---

[8] As used herein below, the term "Carvana Locations" now solely refers to those particular locations and/or sites (collectively) for which EFM and Triplett ultimately executed Service Agreements.

sample of a Seasonal Service Agreement is attached hereto as **Exhibit 4** and is incorporated by reference as if fully set forth herein.

47.     All of the Seasonal Service Agreements are substantively the same (or substantially the same) but for the information specific to each particular Carvana Location (*e.g.*, Facility Details and Payment Information).

48.     The approximately eighteen (18) remaining Service Agreements obligate Triplett Contracting to provide such services on a "per event" basis (each, a "Per Event Service Agreement," and collectively, the "Per Event Service Agreements").  A true and correct copy of a representative sample of a Per Event Service Agreement is attached hereto as **Exhibit 5** and is incorporated by reference as if fully set forth herein.

49.     All of the Per Event Service Agreements are substantively the same (or substantially the same) but for the information specific to each particular Carvana Location (*e.g.*, Facility Details and Payment Information).

50.     Indeed, ***all*** of the Service Agreements—regardless of whether they are Seasonal Service Agreements or Per Event Service Agreements—are substantively the same (or substantially the same) but for the information specific to each particular Carvana Location (*e.g.*, Facility Details and Payment Information).  *Compare* Exhibit 4 *with*, Exhibit 5.

51.     Further, ***all*** of the Service Agreements incorporate by reference Exhibits 1 through 9 thereto, certain Definitions (the "Definitions"), and Terms & Conditions (the "Terms & Conditions") that are contained on EFM's Partner Portal located at the following URL: https://www.expressfmg.com/partner-portal/ (the "Partner Portal").

52.     Exhibits 1 through 9 incorporated by reference into the Service Agreements, which are contained on the Partner Portal, are as follows:

| Exhibit 1 | Quality Standards for Vendors (the "Quality Standards") |
|---|---|
| Exhibit 2 | Key Performance Indicators (the "KPIs") |
| Exhibit 3 | New Vendor Safety |
| Exhibit 4 | Service Provider Invoicing Instructions |
| Exhibit 5 | EFM Supplier Code of Conduct (the "Code of Conduct") |
| Exhibit 6 | Insurance Requirements |
| Exhibit 7 | Work Orders |
| Exhibit 8 | Service Provider Screening Process |
| Exhibit 9 | Incident Management |

*See* Partner Portal.

53.     The Award Letter, Service Agreements (including, but not limited to, the Scope of Services, as defined below), Exhibits 1 through 9 incorporated by reference therein, the Definitions, and Terms & Conditions, are collectively referred herein below as the "Agreement."

54.     Mr. Triplett executed the Agreement, including, but not limited to, each of the Service Agreements comprising a portion thereof, on behalf of Triplett Contracting, in his capacity as Chief Executive Officer.

**IV.     Key Terms and Components of the Agreement.**

**A.     The Service Agreements.**

55.     All of the Service Agreements have an effective date of November 1, 2022 (collectively, the "Effective Date"). *See, e.g.*, Seasonal Service Agreement, p. 2.

56.     The initial term (the "Term") of the Service Agreements commenced on the Effective Date and was to continue through the end of the day immediately preceding April, 30,

2023 (the "Expiration Date"), unless earlier terminated pursuant to the terms of the Service Agreements and/or Agreement.  *See, e.g., id.*

57.    In consideration of Triplett Contracting performing snow removal services under the Agreement, the Service Agreements require that Triplett Contracting be compensated and reimbursed for eligible reimbursements as described in the Service Agreements (*e.g.*, in the form and amount specified on each Service Agreement's "Facility Details and Payment Information" page).  *See, e.g., id.* at p. 2, § A.1; *id.* at p. 6.

58.    The Service Agreements require that Triplett Contracting submit invoices to EFM in compliance with Section A.2 thereto.  *See, e.g.*, *id.* at p. 2, § A.2d.  *See also* Exhibit 4 titled "Service Provider Invoicing Instructions" set forth on the Partner Portal (containing invoice submittal methods, requirements, and grounds for rejection/delays in payment), which, as stated above, is incorporated by reference into the Agreement.  *See* Partner Portal, Exhibit 4, pp. 1-2.

59.    Under the Agreement, any undisputed sums invoiced by Triplett Contracting to EFM are payable within thirty (30) days of the billing cycle.  *See id.*  For clarity, "[EFM] pays for services rendered, which means only after the service has been performed, so in the case of recurring contracts, the service is not considered complete until the final day of the month."  *See id.* at p. 2 (Net 30 Terms).

60.    The Service Agreements are recurring contracts.

61.    So, based on the particular month that services are performed under the Service Agreements, invoice submittal dates and payment dates are as follows for undisputed sums:

| Billing Month | Invoice Submittal Date | Expected Payment Date |
|---|---|---|
| January | 31-Jan | 2-Mar |
| February | 28-Feb | 30-Mar |
| March | 31-Mar | 30-Apr |
| April | 30-Apr | 30-May |
| May | 31-May | 30-Jun |
| June | 30-Jun | 30-Jul |
| July | 31-Jul | 30-Aug |
| August | 31-Aug | 30-Sep |
| September | 30-Sep | 30-Oct |
| October | 31-Oct | 30-Nov |
| November | 30-Nov | 30-Dec |
| December | 31-Dec | 30-Jan |

*See id.*

62.     Moreover, Section A.4 of the Service Agreements state as follows: "Upon receipt of payment, [Triplett Contracting] shall promptly pay all bills for labor and materials performed and furnished by others in connection with the Services.  Any amounts charged incorrectly or for non-conforming Services by [Triplett Contracting] shall be refunded by [Triplett Contracting] immediately upon the discovery thereof without additional cost to or further demand by EFM." *See, e.g.*, Seasonal Service Agreement, p. 2, § A.4.

63.     The Agreement can be terminated, *inter alia*, pursuant to Section B of Service Agreements.  *See, e.g.*, *id.* at p. 3, § B.

64.     Section B.1 of the Service Agreements state, *inter alia*, that "EFM may terminate or suspend [sic] this Agreement and/or Work Order, either in whole or in part and with respect to one or more of the Facilities, without liability, fee or penalty, at any time and without cause upon thirty (30) days prior written notice to [Triplett Contracting]."  *See, e.g.*, *id.* at § B.1.

65.     Sections B.2-3 further provide that the Agreement can be terminated for a Default, with the following events and conditions constituting a "Default" under the Service Agreements: "(a) a breach, failure to perform or comply with, or defect or delay in performance by [Triplett

14

Contracting] of any the [sic] terms and conditions of, or, of its obligations under, this Agreement; or (b) any representation or warranty of [Triplett Contracting] in this Agreement is false or misleading in any material respect." *See, e.g., id.* at § B.2-3.

66.     Furthermore, "[i]f [Triplett Contracting] is in Default in the performance of the Services or breaches any of its covenants, agreements, or obligations under th[e] Agreement or any Work Order, and such Default is not corrected within five (5) days of receipt of written notice from EFM (unless such Default cannot be cured with the payment of a sum of money and otherwise cannot reasonably be cured within such five (5) days period, in which event [Triplett Contracting] shall have an additional ten (10) days to cure such Default, provided such cure is promptly, continuously and diligently pursued), EFM may in its sole and absolute discretion thereafter immediately terminate the Agreement and/or any such Work Order, either in whole or in part with respect to one or more Facilities, by written notice to [Triplett Contracting]." *See, e.g., id.* at § B.3.

67.     The Service Agreements further state under Termination For Default that, "EFM may in its sole and absolute discretions [sic] thereafter immediately terminate any other contracts [Triplett Contracting] currently has in place with EFM based upon a default in the performances or breach in a separate Agreement between EFM and [Triplett Contracting], and/or any such Work either in whole or in a part with respect to one of [sic] more of the Facilities by written notice to [Triplett Contracting]."   For purposes of clarity, the Service Agreements provide the following example: "if [Triplett Contracting] breaches or is in default of its performance on Contract for Facility "A", EFM may immediately terminate the Contract it has with [Triplett Contracting] for Facility "B" even if the Contract for Facility "B" is unrelated to the Contract for Facility "A." *Id.* Furthermore, "upon the occurrence of any such Default by [Triplett Contracting] that is not cured

within such period (or in the case of an emergency, at any time prior thereto and without the need for notice), without thereby waiving such Default or any of EFM's other rights or remedies, and without liability to [Triplett Contracting] in connection therewith, EFM or its designee may (but shall not be obligated to) perform any such covenant, agreement or obligation under this Agreement or any Work Order for the account at the expense of [Triplett Contracting], which [Triplett Contracting] shall pay immediately upon demand together with all costs and expenses incurred by EFM in enforcing its rights against [Triplett Contracting]." *See, e.g., id.* at pp. 4-5, § B.3.

68.    Upon any form of termination, the Service Agreements state that "[Triplett Contracting] shall be paid only for Services properly rendered prior to the effective date of the termination as determined by EFM.  EFM, however, may withhold payments due [to Triplett Contracting] upon its Default for the purpose of set-off until such time as the exact amount of damages due to EFM from [Triplett Contracting] is determined and received by EFM." *See, e.g., id.* at p. 5, § B.3.

69.    Importantly, notwithstanding the Service Agreements' Termination or Suspension for Convenience and Termination for Default provisions discussed above (*i.e.*, Sections B.1 and B.2, respectively), the Agreement can be terminated immediately upon the following:

a.    Closure of site or loss of contract by from client;

b.    Non-performance to SOW;

c.    Repeated complaints from Client without effective resolution;

d.    Dishonestly or corruption; and

e.    Violation of the Code of Conduct.

*See, e.g., id.* at p. 5, § B.5.

70.     And, "[u]pon the expiration or termination of this Agreement and/or any Work Order, [Triplett Contracting is required to] cooperate for a period of time following such expiration or termination to be determined by EFM to assure the orderly transition of all Services back to EFM or to an alternative service provider designated by EFM to ensure that the Services are maintained without interruption[,]" as further set forth by the terms of Section B.4 of the Service Agreements.  *See, e.g., id.* at p. 5, § B.4.

71.     Finally, each Service Agreement contains the same "SNOW/ICE MANAGEMENT SCOPE OF SERVICES."  *See, e.g.*, *id.* at pp. 7-8 (the "Scope of Services").

72.     The Scope of Services sets forth the "Program Overview" of Triplett's services, General Responsibilities, Salting Service obligations, Anti-Icing Service obligations, and Snow Management obligations, all of which are hereby expressly incorporated by reference into this Complaint as if set forth at length herein.  *Id.*

73.     However, of particular importance in connection with EFM's conduct giving rise to this Action (as discussed more fully below), the Scope of Services requires, *inter alia*, that Anti-Icing Service "be done prior to snow events or freezing rain if conditions warrant.  This service will be completed by using either Sodium Chloride or a liquid deicing product.  This will be applied before the winter precipitation begins.  Anti-icing Service keeps the snow from bonding to the surface and immediately gives traction.  It melts snow from the bottom up."  *Id.* at p. 7.

**B.     Terms & Conditions.**

74.     As set forth above, EFM requires that all of its facility management suppliers comply and consent to be bound by EFM's Terms & Conditions contained on the Partner Portal, and Triplett Contracting was no exception.

75. The Terms & Conditions, to the extent they have not been already, are incorporated by reference as if fully set forth herein.

76. Section G of the Terms & Conditions is particularly relevant to this Action, wherein Triplett Contracting represents, warrants, and covenants, *inter alia*, that:

- "it is fully equipped to and qualified to perform the Services and that it is financially solvent, able to pay its debts as they mature, and possesses sufficient working capital to provide the Services contemplated [by the Agreement];
- it has visited and had the full opportunity to review and has carefully examined the Facilities and has satisfied itself as to the character, quality, and quantity of the Services to be performed, the conditions that may be encountered at the Facilities or that may otherwise affect the cost or difficulty of performing the Services, the labor, equipment, supplies, and materials to be furnished, supplied, or utilized in connection with the performance of the Services, and all other requirements of this Agreement;
- [Triplett Contracting] Personnel and subcontractors that it will use to provide and perform the Services have and will continue to have, the knowledge, skills, experience, expertise, language and speaking capabilities, and qualifications and resources to provide and perform the Services in accordance with this Agreement in a diligent, workmanlike manner with due care and skill; and
- it shall maintain appropriate backup, contingency, and remedial plans necessary to ensure [its] continues performance under this Agreement despite labor disturbances, strikes, lockouts, transportation problems, technology problems, equipment breakdowns, and similar events."

*See* Terms and Conditions § G; *see also id.* at § H (Service Warranty), § J (Service Provider Personnel), § N (Insurance Requirements), § O (Indemnification and Settlement), and § P (Confidentiality Obligations).

## V. Triplett Breaches the Agreement In Connection With Servicing the Carvana Locations.

### A. Triplett Failed To Properly Stage The 4 Large ICs.

77. As aforesaid, the Award Letter was delivered to Triplett Contracting on or about October 20, 2022, the same date the Parties discussed and agreed upon the Parties' staging equipment at the 4 Large ICs in advance of the 2022-2023 winter season (which commenced on November 1, 2022).

18

78.     However, as of November 23, 2022, Triplett Contracting failed to stage the 4 Large ICs and, thus, by November 23, 2022, Carvana had asked EFM for an update concerning this critical service component.

79.     On or about November 23, 2022, EFM sent an email to Triplett Contracting explaining the aforesaid, and inquiring into the type of equipment that Triplett Contracting had planned on delivering so that EFM could inform Carvana of the same.

80.     EFM did not receive an adequate response from Triplett Contracting; consequently, on or about November 30, 2022, EFM sent Triplett Contracting formal notice that it had, *inter alia*, failed to satisfy this condition of the Agreement (the "Staging Letter").  A true and correct copy of the Staging Letter is attached hereto as **Exhibit 6** and is incorporated by reference as if fully set forth herein.

81.     Triplett did not timely respond to or cure the deficiencies set forth in the Staging Letter; consequently, on or about December 5, 2022, EFM followed up with Triplett Contracting requesting confirmation on when staging at the 4 Large ICs was going to be completed.

82.     On or about December 8, 2022—after EFM was contacted by at least two (2) Carvana Locations requesting status updates on the required staging—EFM followed up with Triplett Contracting again requesting confirmation on when staging was going to be completed, as well as what specific equipment Triplett Contracting was planning to deliver to certain Carvana Locations.

83.     On or about December 8, 2022 Triplett Contracting responded to EFM s inquiry, explaining that one (1) of its employees is working on allocating that equipment and it should have details for EFM shortly thereafter; then, later that same date, Triplett Contracting informed EFM that equipment for the Delanco IC would be delivered on December 9, 2022.

84.     With that said, by on or about December 9, 2022—well into the 2022-2023 winter season—EFM needed, and requested, updates on equipment deliveries for all Carvana Locations that required staging, as Carvana's corporate team has begun to express serious frustration to EFM.

85.     On or about December 12, 2022, Triplett Contracting told EFM during a meeting that equipment for the 4 Large ICs was going to be delivered on December 13, 2022.

86.     However, on or about December 13, 2022, it became clear that Triplett Contracting had not delivered any equipment to the 4 Large ICs on December 13, 2022, as Triplett Contracting represented would be the case on December 12, 2022.

87.     On or about December 14, 2022, Triplett Contracting told EFM the following delivery statuses in connection with staging the 4 Large ICs:

| Location Name | EFM Location ID | Delivery Status |
|---|---|---|
| Delanco IC | NJ2001 | Equipment would be delivered by **December 15, 2015.** |
| Indianapolis IC | IN2001 | Equipment would be delivered by **December 15, 2015.** |
| Elyria IC | OH2004 | Equipment would be delivered by **December 14, 2015.** |
| Trenton IC | OH2005 | Equipment had been **delivered**. |

88.     Triplett Contracting updated its delivery statuses in connection with staging the 4 Large ICs on December 15, 2022:

| Location Name | EFM Location ID | Delivery Status |
|---|---|---|
| Delanco IC | NJ2001 | Equipment had been **delivered**. |
| Indianapolis IC | IN2001 | Equipment would be delivered by **December 16, 2015.** |
| Elyria IC | OH2004 | Equipment had been **delivered**. |

| Trenton IC | OH2005 | Equipment had been **delivered**. |
|------------|--------|-----------------------------------|

89.     However, on or about December 15, 2022, EFM was forced to ask Triplett Contracting to confirm the pieces of equipment that had reportedly been delivered to the 4 Large ICs as well because EFM learned that only one (1) skidsteer had been delivered the previous day to the Elyria IC, and it was understood by all Parties that the Elyria IC required a second (2nd) skidsteer and a bucket loader/track loader, at a minimum, in order for Triplett Contracting to properly service said location on behalf of EFM.

90.     The aforesaid, *inter alia*, resulted in EFM issuing Triplett Contracting a Notice of Contract Deficiency and Required Action dated December 16, 2022 (the "Notice of Contract Deficiency and Required Action), which formally ordered Triplett Contracting cure certain deficiencies, including, but not limited to, staging the 4 Large ICs by December 20, 2022.  A true and correct copy of said Notice of Contract Deficiency and Required Action is attached hereto as **Exhibit 7** and is incorporated by reference as if fully set forth herein.

91.     By on or about December 19, 2022, a substantial snow storm was forecasted to reach, *inter alia*, the states in which the 4 Large ICs are located and, amidst the ongoing frustration by EFM and Carvana, EFM directed very specific questions to Triplett Contracting concerning the delivery status of heavy equipment that was not yet delivered to the 4 Large ICs (and other Carvana Locations), despite Triplett's above-referenced, repeated and continuous representations to the contrary.

92.     Triplett Contracting's response on or about December 19, 2022 was that two (2) of its employees were working on the requested updates, and that Triplett Contracting would be providing EFM with the requested updates the following morning.

93.     Triplett Contracting's continued failing efforts to stage the 4 Large ICs (and other Carvana Locations) by mid-to-late December 2022, after the time Triplett Contracting was required to cure the deficiencies set forth in the Notice of Contract Deficiency and Required Action, represent a material breach of the Agreement, including, but not limited to, certain above-referenced provisions of the Award Letter, Terms & Conditions, and Services Agreements (including, *inter alia*, the Scope of Services attached thereto).

94.     It also materially contributed to other material breaches of the Agreement, as detailed below.

**B.      Triplett Failed To Properly Provide Snow Removal Services When Required, Resulting in Additional Breaches Of The Agreement.**

95.     Despite Triplett Contracting's material representations about its ability to "self-perform" snow removal services at the Carvana Locations, which materially induced EFM to award Triplett Contracting its bid to provide snow removal services on its behalf at the Carvana Locations, Triplett Contracting materially breached the Agreement by failing to service the Carvana Locations properly.

96.     As a ***representative sample*** of Triplett Contracting's failures in this regard, particular breaches that arose in connection with the (a) Milwaukee Hub; (b) Eagan Hub; (c) University Park IC; and (d) Trenton IC, are detailed herein below.

**i.      *Milwaukee Hub.***

97.     Triplett Contracting failed to properly service the Milwaukee Hub Carvana location effectively, which resulted in material breaches of the Agreement.

98.     The Milwaukee Hub is located at 561 West College Avenue, Suite B, Oak Creek, Wisconsin.

99.     On or about November 29, 2022, EFM and Triplett Contracting entered into a Seasonal Service Agreement for the Milwaukee Hub in consideration of Ten Thousand Six Hundred Forty Three Dollars and Thirty Three Cents ($10,643.33).

100.    Mr. Triplett executed the above-referenced Service Agreement on behalf of Triplett Contracting.

101.    The Milwaukee Hub Seasonal Service Agreement bears Agreement No. WI10479.

102.    On or about December 16, 2022, EFM asked Triplett about its plans for servicing the Milwaukee Hub in anticipation of a forecasted snow storm.

103.    Mr. Triplett responded on or about December 16, 2022, on behalf of Triplett Contracting stating, it "will have a plan of action for this area.  We do also have the crew on standby and are monitoring weather events if a dispatch is needed."  In slight contrast, a Triplett employee followed up to Mr. Triplett's email shortly thereafter, stating, "[t]his location was salted last night in preparation of today's incoming weather.  Just spoke to our tech.  There is currently some snow flurries but nothing accumulating at this time.  He is on standby in case anything changes."

104.    EFM sought clarification to determine whether this was the first time Triplett Contracting salted the Milwaukee Hub because Triplett Contracting is required to notify EFM when services are being performed on its behalf under the Agreement.

105.    To EFM's surprise, Mr. Triplett represented, on behalf of Triplett Contracting, that Triplett Contracting had serviced the Milwaukee Hub in the past, meaning prior to December 16, 2022.  Mr. Triplett also stated that "[i]t is always our plan to provide updates when services are scheduled and have been executed, as per the email I just emailed you, under the "updates" section. I deeply apologize if that update was not done, I did however speak with the team in the past hour

and everyone is aware that we will provide updates everytime [sic] there is a schedule made for a dispatch, send a reminder 2 hours prior to said dispatch as well as provide bi-hourly updates if not more, once a service is taking place."

106.    A true and correct copy of said email thread (the "12/16/22 Email Thread") is attached hereto as **Exhibit 8** and is incorporated by reference as if fully set forth herein.

107.    Despite the aforesaid communications between the Parties on December 16, 2022, beginning on or about December 21 to 22, 2022, Triplett Contracting was required to have serviced the Milwaukee Hub based on forecasted weather patterns that Triplett should have been monitoring; however, Triplett Contracting neither provided said services nor provided an update to EFM in connection with such required services.

108.    So, on or about December 22, 2022, EFM contacted Triplett Contracting after receiving calls from the Milwaukee Hub (and another Wisconsin Carvana Location) asking when salting would be completed.  After not receiving a response for the better part of the day, EFM followed up with Triplett Contracting.  Eventually, Triplett Contracting responded stating that it "is just awaiting confirmation from the crews on this location and should have that shortly.  Just wanted you to know we are handling it.  Thank you."

109.    A true and correct copy of said email thread (the "12/22/22 Email Thread") is attached hereto as **Exhibit 9** and is incorporated by reference as if fully set forth herein.

110.    However, Triplett Contracting did not "handle it."  On or about December 22, 2023, Carvana's Team Leader at the Milwaukee Hub contacted EFM to inform EFM that no one had been to the Milwaukee Hub to provide salt or plowing services and requested an estimated time of arrival.

111.    The foregoing demonstrates Triplett Contracting's pattern and practice of failing to adequately monitor incoming weather forecasts and provide updates to EFM as required under the Agreement.

112.    More problematically, however, the foregoing demonstrates Triplett Contracting's pattern and practice of failing to dispatch to Carvana Locations in a timely fashion as required under the Agreement.

113.    Indeed, on or about December 27, 2022, Carvana's Team Leader at the Milwaukee Hub contacted EFM stating the Milwaukee Hub "lot is iced over and packed down with snow." Carvana's Team Leader at the Milwaukee Hub also stated to EFM on December 27, 2022 that "[i]t was [her] understanding that someone was going to be coming out here last week to salt the lot (front and back) and no one has been here yet."  Thus, Carvana's Team Leader requested that someone be dispatched to salt because "it is not safe since nothing has been done since the initial snow last week."

114.    EFM explained to Carvana's Team Leader that its contractor, meaning Triplett Contracting, had informed EFM that it had dispatched to the Milwaukee Hub the previous week, and asked whether anyone had showed up at all over the previous several days (*i.e.*, between December 22, 2022 and December 27, 2022).

115.    To EFM's surprise, Carvana's Team leader responded that "no one has been on-site to salt the front or back of the lot at all this year.  We had someone come and ask a few questions about where to put the snow but they did not return after that and no salting was done."

116.    A true and correct copy of said email thread (the "12/27/22 Email Thread") is attached hereto as **Exhibit 10** and is incorporated by reference as if fully set forth herein.

117.    Thereafter, the reason for which the Milwaukee Hub had not been serviced properly by Triplett Contracting by on or about December 29, 2022 became known; Triplett Contracting attempted to outsource the work to a plow company that, itself, failed to perform services at the Milwaukee Hub.

118.    Thus, instead of Triplett Contracting dispatching one or more of its primary crews to service the Milwaukee Hub, it attempted to outsource the job to a plow company that resulted in precisely that which EFM's practice of partnering with facility management suppliers who can adequately provide services with its own primary crews seeks to avoid: a reduction in (or, in this case, complete non-performance of) consistent and quality services.

119.    As a result of Triplett's conduct as aforesaid, EFM was forced to engage a replacement vendor to service the Milwaukee Hub for the cost of Two Thousand Six Hundred Twenty Five Dollars ($2,625), with EFM incurring a loss in connection therewith.

120.    EFM continues to service the Milwaukee Hub, although EFM now operates at a monthly loss of Six Hundred Forty Nine Dollars ($649).

121.    Indeed, as a result of Triplett Contracting failing to service the Milwaukee Hub properly under the Agreement, EFM sustained damages, the exact amount of which will be proven at trial.

   **ii.    *Eagan Hub*.**

122.    Additionally, Triplett Contracting failed to properly service the Eagan Hub Carvana Location effectively, which resulted in material breaches of the Agreement as evidenced, by, *inter alia*, the following occurrences throughout December 2022 that led to Carvana personnel being locked inside of the Eagan Hub and the Eagan Hub being forced to shut down business operations for a period of time.

123.    The Eagan Hub is located at 3306 Mike Collins Drive, Eagan, Minnesota.

124.    On or about November 29, 2022, EFM and Triplett Contracting entered into a Seasonal Service Agreement for the Eagan Hub in consideration of Two Thousand Seven Hundred Fifty Four Dollars and Thirty Six Cents ($2,754.36).

125.    Mr. Triplett executed the above-referenced Service Agreement on behalf of Triplett Contracting.

126.    The Eagan Hub Seasonal Service Agreement bears Agreement No. MN10467.

127.    On or about December 14, 2022, the Parties were aware of a snowstorm that was effecting the Eagan Hub, thereby requiring Triplett Contracting's services.

128.    However, on or about December 15, 2022, Carvana personnel at the Eagan Hub had contacted EFM to inform EFM that nobody from Triplett Contracting had been out to the Eagan Hub to provide plowing services.

129.    Indeed, on or about December 15, 2022, Carvana personnel at the Eagan Hub contacted EFM to inform EFM that notwithstanding the fact that it had been snowing as of the previous morning, Triplett Contracting dispatched to the Eagan Hub too late, only to salt on top of several inches of snow.

130.    Neither Eagan Hub personnel nor EFM understood the reasons for which Triplett Contracting had not provided plowing services as required under the Agreement as aforesaid.

131.    Furthermore, on or about December 22, 2022, Triplett Contracting apparently attempted to service the Eagan Hub but claimed there was no key in the lock box on site.

132.    So, after informing EFM of the same, EFM told Triplett Contracting that it had contacted Carvana personnel at the Eagan Hub, learned that the Eagan Hub would not be reopened until the following morning (*i.e.*, December 23, 2022) at 6:00 a.m., and specifically ordered

Triplett Contracting to return to the Eagan Hub the following morning to salt and address snow removal at that time.

133.    Notwithstanding, Triplett Contracting returned to the Eagan Hub the night of December 22, 2022—contrary to EFM's expressed order—to find itself unable, for a second time, to gain access to the Eagan Hub to perform the services required under the Agreement.

134.    By December 23, 2022, when the Eagan Hub reopened, Triplett Contracting did not have a primary crew available to service the Eagan Hub; so, Triplett Contracting told EFM that it was allocating a back-up team and would provide an update to EFM when said team was onsite.

135.    Triplett Contracting's back-up team did not arrive to perform snow removal services on December 23, 2022, and Carvana's personnel at the Eagan Hub returned the morning of December 24, 2022, became snowed in, and were forced to shut down the Eagan Hub for a period of time.

136.    As a result of Triplett's conduct, as aforesaid, Carvana terminated its agreement with EFM to service the Eagan Hub, and Carvana hired its own replacement vendor to service said Carvana Location, which resulting in, *at a minimum*, lost revenue in the amount of Twenty Nine Thousand Nine Hundred Thirteen Dollars and Three Cents ($29,913.03) with respect to EFM servicing said Carvana Location during the above-referenced storm.

137.    Indeed, as a result of Triplett Contracting failing to service the Eagan Hub properly under the Agreement, EFM sustained damages, the exact amount of which will be proven at trial.

iii.    *University Park IC.*

138.    A similar situation as aforesaid occurred in University Park, Illinois; however, this time, with respect to issues related to the University Park IC, Mr. Triplett, on behalf of Triplett Contracting, was caught lying about the performance of Triplett's Contracting services.

139.    The University Park IC is located at 23619 South Cicero Avenue, University Park, Illinois.

140.    On or about December 1, 2022, EFM and Triplett Contracting entered into a Seasonal Service Agreement for the University Park IC in consideration of Forty Two Thousand Eight Hundred Sixty Seven Dollars and Fifty Cents ($42,867.50).

141.    Mr. Triplett executed the above-referenced Service Agreement on behalf of Triplett Contracting.

142.    The University Park IC Seasonal Service Agreement bears Agreement No. IL10283.

143.    During the morning of December 16, 2022, EFM contacted Triplett Contracting to inform Triplett Contracting that it should be closely monitoring snow fall with respect to the University Park IC because the Carvana manager at said Carvana Location had called EFM to request the same.

144.    Thereafter, also on December 16, 2022, the Carvana manager at the University Park IC contacted EFM again to inform EFM that a number of Carvana employees had already fallen throughout the morning a result of slipping on ice in multiple areas.

145.    Consequently, the University Park IC Carvana manager was forced to shut down business operations for a period of time at this Carvana Location due to slick conditions on the

lots, and asked EFM the reasons for which the Carvana Location had not already been serviced the previous night or early in the morning of December 16, 2022.

146.    EFM shared this information with Triplett Contracting and specifically asked for Triplett Contracting's action plan so that it could notify the University Park IC personnel of same.

147.    Notwithstanding the aforesaid, the following Monday—December 19, 2022—the Carvana manager at the University Park IC contacted EFM to inform EFM that he did not see any crew members servicing the location the previous Friday, and even checked with the staff who said that nobody showed up to salt.  Accordingly, the Carvana manager audited the grounds onsite, did not see any salt, and confirmed to EFM that the same portion of the lot that was dangerously icy on Friday remained dangerous on that Monday.  This led to the Carvana manager questioning whether services had been performed there at all.

148.    When EFM asked Triplett Contracting about said occurrence, Mr. Triplett told EFM that he knew crews were dispatched to the University Park IC, but that they arrived after hours, which could represent the reason for which nobody at Carvana had seen them.

149.    However, the University Park IC is opened for business twenty-four (24) hours per day, so Mr. Triplett's explanation does not truthfully explain Triplett Contracting's failures.

150.    As a result of Triplett's conduct as aforesaid, EFM was forced to engage and negotiate with a replacement vendor to service the University Park IC at increased rates to salvage its agreement with Carvana to service said Carvana Location in connection with the 2022-2023 winter season.

151.    EFM is paying said replacement vendor at the rate of Eight Thousand Nine Hundred Thirty Dollars ($8,930) per month, and is now operating at a monthly loss of Two Hundred Sixty Eight Dollars and Fifty One Cents ($268.51) in connection with servicing the University Park IC.

152.    As a result of Triplett Contracting failing to service the University Park IC properly under the Agreement, EFM sustained damages, the exact amount of which is to be proven at trial.

   **iv.    *Trenton IC.***

153.    Triplett Contracting's most egregious breaches of the Agreement occurred in connection with servicing the Trenton IC, as detailed below.

154.    The Trenton IC is located at 5506 Kennel Road, Trenton, Ohio.

155.    On or about November 29, 2022, EFM and Triplett Contracting entered into a Seasonal Service Agreement for the Trenton IC in consideration of One Hundred Fifty Seven Thousand Three Hundred Ninety Two Dollars and Twenty Cents ($157,392.20).

156.    Mr. Triplett executed the above-referenced Service Agreement on behalf of Triplett Contracting.

157.    The Trenton IC Seasonal Service Agreement bears Agreement No. OH10477.

158.    Given, *inter alia*, Triplett Contracting's conduct as aforesaid, prior to the first major snow storm expected to hit the Trenton IC on or about December 22, 2022 (the "Bomb Cyclone"), Carvana corporate personnel had contacted EFM multiple times concerned about consistent and quality service of said location, and requested specific plans and arrival times for the crews being dispatched by Triplett Contracting to said Carvana Location.

159.    So, on December 20, 2022, EFM and Triplett Contracting had a telephone conference to discuss Triplett Contracting's plan of action in connection with servicing the Trenton IC ***prior to the Bomb Cyclone reaching Trenton, Ohio***.

160.    During said telephone conference, EFM stressed the importance of Triplett being prepared for the Bomb Cyclone, which required ordering Triplett Contracting's technicians to book hotel rooms in close geographical proximity to the Trenton IC if necessary for purposes of

31

performing required services under the Agreement; Triplett assured EFM that it had the situation covered and that EFM did not need to worry about its performance.

161.    Following the telephone conference, on December 21, 2022, EFM contacted Triplett Contracting multiple times ordering that Triplett Contracting schedule salting services at the Trenton IC (and other Carvana Locations affected by the Bomb Cyclone) according to the plan of action ordered by EFM to Triplett Contracting, to which Triplett Contracting agreed, in light of expected freezing rain and sub-zero (-0) temperatures in Ohio and elsewhere.

162.    In particular, on December 21, 2022, EFM ordered Triplett Contracting to dispatch and service certain ICs, including, but not limited to, the Trenton IC, ***no matter what***; EFM provided this order to Triplett because said ICs, including, but not limited to, the Trenton IC, represented those that had been in constant contact with EFM and require special attention due to their sizes and numbers of employees onsite.

163.    However, as of the afternoon of December 21, 2022, Mr. Triplett responded, on behalf of Triplett Contracting, pushing back on EFM's order, ignoring the order, and telling EFM that these ICs, including, but not limited to, the Trenton IC, were being closely monitored by Triplett with teams on standby if required to be dispatched.

164.    During the morning of December 22, 2022, the Trenton IC contacted EFM and asked when Triplett Contracting would be arriving onsite to perform services.

165.    During the morning of December 22, 2022, Triplett Contracting responded to EFM by telling EFM, *inter alia*, that Triplett Contracting plans to be there ***by the time it starts to snow and there is risk of ice***—which Triplett Contracting expected to be by at or around 10:00 p.m.— despite that not representing what the Parties agreed to, or, more importantly, the order provided to Triplett Contracting by EFM, as aforesaid.

32

166.     Nevertheless, during the evening of December 22, 2022, Triplett Contracting advised EFM that it already dispatched its technicians to the Trenton IC who would, indeed, be arriving around 10:00 p.m. and servicing the Trenton IC until roughly 2:00 a.m.

167.     However, as of the morning of December 23, 2022, as detailed below, Carvana personnel contacted EFM to inform EFM that the Trenton IC needed plowing services as soon as possible because when Carvana personnel arrived onsite that morning, it had not looked like anyone had performed services, which was affecting Carvana's business operations.

168.     The foregoing was confirmed later that morning on December 23, 2022, as detailed below, when another manager at the Trenton IC contacted EFM and told EFM that there was no evidence of salting or plowing having been completed either the previous night or earlier that morning, and that only one (1) piece of equipment, a bobcat, had been delivered; as a result, the Trenton IC was completely covered in snow.

169.     When confronted by EFM about the aforesaid, Triplett Contracting responded by telling EFM that the team it dispatched to the Trenton IC had delays getting to the site the previous evening as a result of the severe weather that had been discussed and that represented the very reason EFM instructed Triplett Contracting to dispatch to Trenton, Ohio on December 21, 2022 *ahead of* the Bomb Cyclone.

170.     Thus, Triplett Contracting's primary crew did not arrive at the Trenton IC as promised and ordered.

171.     In lieu thereof, Triplett Contracting dispatched a secondary team at approximately 6:00 p.m. on or about December 22, 2022, who arrived onsite on December 23, 2022 at approximately 11:00 a.m., nearly a full day after the Bomb Cyclone had blanketed Trenton, OH.

172.    And, Triplett Contracting's secondary crew consisted merely of two (2) gentlemen arriving in a Ford Fusion sedan.

173.    Moreover, as aforementioned, all of the required equipment that was required to have been staged was not; so, these two (2) gentleman, assuming *arguendo* that they were competent (which they proved not to be), were tasked with clearing a sixty one (61) acre lot within a twenty-four (24) hour timespan given the hard deadline of services required to have been completed for Carvana by 10:00 a.m. on December 24, 2022, a nearly impossible task that substantiates the necessity of Triplett Contracting having dispatched its primary crew to Trenton, OH on December 21, 2022, as ordered in the first place.

174.    Indeed, when the above-referenced two (2) gentleman arrived at the Trenton IC on December 23, 2022, confusion resulted because they were not asked by Triplett Contracting and/or prepared to perform the services that were required pursuant to the Agreement.

175.    Specifically, in stark contrast to EFM's order to Triplett Contracting as aforesaid, upon arriving onsite on December 23, 2022, when Carvana's Associate General Manager of the Trenton IC asked these gentlemen if they had been dispatched to plow the drive lanes and remove snow, at least one (1) of the gentleman responded that they were not; and remarked that they had only arrived on site to clear the sidewalk and door areas, and even went as far as to ask whether Carvana had equipment and supplies for them to use.

176.    Moreover, when Carvana personnel at the Trenton IC informed these gentleman that they were supposed to have been dispatched to clear the entire sixty one (61) acre lot—as opposed to merely clearing the sidewalk and door areas—Triplett Contracting's secondary crew responded with laughter, and told Carvana's Assistant General Manager "well that's not us."

177.    At the time, as alluded to above, the Trenton IC was covered in ice and snow and blowing snow drifts that resulted in accumulations of approximately ten (10) inches of snow in certain spots of the Trenton IC.  Driving on the lot was, therefore, nearly impossible, and the risk of slip and falls was extremely high.  Furthermore, Carvana, *itself*, pre-salted around its Fire Doors that previous night, but with the drop in temperature and Triplett Contracting's failure to perform snow removal services as required under the Agreement, most of the Fire Doors were frozen shut by the morning of December 23, 2022, thereby causing a very large safety risk in the event a fire were to occur.  Carvana's Associate General Manager determined that, overall, it was extremely dangerous to be on site at the time, and that said danger could have been prevented by having a small crew dispatched to the Trenton IC with the correct equipment to handle the job.

178.    When Carvana's Assistant General Manager of the Trenton IC reported the aforesaid to Carvana's General Manager thereof, it reflected extremely poorly on EFM.

179.    Specifically, the Trenton IC General Manager explained that the Trenton IC's experience with **EFM** had been an "absolute disaster for [its] first severe weather of the season," which was a direct result of Triplett's failures.

180.    In turn, as alluded to above, Carvana issued a complaint to EFM shortly thereafter on that same date.

181.    The foregoing evidences not only a material breach of the Agreement by Triplett Contracting, but also another instance of Mr. Triplett, on behalf of Triplett Contracting, representing to EFM that its primary crews were going to be dispatched and ready to perform services under the Agreement ***in advance*** of a severe storm warning (in this case, the Bomb Cyclone) when Mr. Triplett, on behalf of Triplett Contracting, knew or should have known that was not the case.

182.    What's more, as aforesaid, these two (2) gentleman consisting of one (1) of Triplett Contracting's secondary crews ran out of diesel at or around 6:00 p.m. on December 23, 2022, left to refuel, and EFM and Carvana were told that they would not be able to make it back to the Trenton IC until December 24, 2022, the following day.

183.    Thus, by the evening of December 23, 2022, EFM had received a call from Carvana informing EFM that it was time for EFM to engage a separate vendor, unaffiliated with Triplett Contracting (the "Trenton IC Replacement Vendor"), to finish servicing the Trenton IC.

184.    The Trenton IC Replacement Vendor was able to arrive at the Trenton IC by approximately 10:30 p.m. that night, in contrast to Triplett Contracting being unable to do so.

185.    Notably, despite Mr. Triplett, on behalf of Triplett Contracting, representing to EFM that approximately fifty percent (50%) of the Trenton IC lot had already been cleared by its secondary crew, when the Trenton IC Replacement Vendor arrived at the Trenton IC, it notified EFM that only approximately five to ten percent (5-10%) of the lot had, in fact, been cleared.

186.    Notwithstanding, the Trenton IC Replacement Vendor was able to substantially complete servicing the Trenton IC by approximately 9:00 a.m. the following morning by working throughout the night.

187.    EFM negotiated a "holiday" service rate with the Trenton IC Replacement Vendor to perform snow removal services at the Trenton IC, which snow removal services the Trenton IC Replacement Vendor did, indeed, perform.

188.    Nevertheless, as a result of Triplett Contracting's failure to service the Trenton IC during the time at which it was being crushed by the Bomb Cyclone, EFM received a number of complaints by Carvana personnel at the Trenton IC that were not effectively resolved by Triplett Contracting.

189.    As a result of Triplett's conduct as aforesaid, Triplett Contracting failed to service to the Trenton IC properly under the Agreement, and EFM sustained damages, the exact amount of which will be proven at trial.

190.    Moreover, on or about December 24, 2022, as a result of Triplett's failure to service the Trenton IC as aforesaid, and, in turn, EFM having received the above-referenced customer complaint from Carvana, EFM issued Triplett a Notice of Contract Termination terminating the Seasonal Service Agreement related to the Trenton IC, bearing Agreement No. OH10477 (the "Trenton IC Notice of Termination"), for the reasons more fully detailed in the Trenton IC Notice of Contract Termination.  A true and correct copy of the Trenton IC Notice of Termination is attached hereto as **Exhibit 11** and is incorporated by reference as if fully set forth herein.

191.    Within two (2) hours of receiving the Trenton IC Notice of Termination, Mr. Triplett, on behalf of Triplett Contracting, sent an email to EFM cancelling all further dispatches and services at *all* of the Carvana Locations; in other words, Triplett Contracting purported to terminate the Agreement entirely without cause or justification in a manner not contemplated by the Agreement, and contrary to provisions of the Agreement that required the Parties to cooperate in such a circumstance.  *See, e.g.*, Seasonal Service Agreement § B.4.

192.    Triplett Contracting's attempted termination of all of the Service Agreements is, itself, a breach of the Agreement as Triplett Contracting did not have cause or justification or any other basis whatsoever for cancelling the Service Agreements effective immediately.

**VI.    Carvana Informs EFM That Carvana Will Not Be Renewing EFM's Snow Removal Contract For The 2023-2024 Winter Season And Beyond.**

193.    As a result of Triplett Contracting's conduct as aforesaid, and in connection with its servicing and/or attempted servicing and/or non-servicing of, the Carvana Locations as required by the Agreement, Carvana told EFM that EFM will not be receiving a renewed agreement from

Carvana to provide snow and ice removal services on its behalf in connection with the 2023-2024 winter season and beyond, as was initially contemplated.

194.    EFM estimates that the loss of revenue resulting therefrom, in connection with the 2023-2024 winter season *alone*, amounts to approximately, at a minimum, Eight Hundred Twenty Nine Thousand Two Hundred Forty Three Dollars and Eight Cents ($829,243.08).

195.    Carvana's decision as aforesaid was based upon, *inter alia*, Triplett Contracting's (a) inability to stage the aforesaid ICs and other Carvana Locations; (b) inability to service the aforesaid ICs and other Carvana Locations; (c) dispatching inadequate personnel to the ICs and other Carvana Locations; and (d) providing inaccurate and/or misleading statements and/or omissions to EFM and/or Carvana while attempting to stage and service the aforesaid ICs and other Carvana Locations.

196.    Furthermore, the foregoing was directly and proximately caused by Triplett materially misrepresenting its capacities and capabilities with the intention of inducing EFM to engage Triplett Contracting as one (1) of its facility management suppliers in the first place, and again in connection with servicing the Carvana Locations.

197.    Indeed, in connection with the 2022-2023 winter season, as a direct and proximate result of Triplett's conduct as aforesaid, EFM was required to write three (3) "postmortem" statements to Carvana explaining the deficiencies that had occurred and outlining how EFM would honor the agreement that it had entered into with Carvana, including, but not limited to, an updated preparedness plan with additional EFM account executives being added to Carvana's account.

198.    Furthermore, although unbeknownst to EFM at the time Triplett decided to engage EFM to become one (1) of EFM's facility management suppliers, and also unbeknownst to EFM at the time EFM bid on providing snow removal services on behalf of Carvana in connection with

the 2022-2023 winter season, as of February 23, 2022 Triplett Contracting had assigned its present and future accounts receivable to eIung Financial Corporation (the "Factor") (the "2/23/22 Assignment"). A true and correct copy of the 2/23/22 Assignment is attached hereto as **Exhibit 12** and is incorporated by reference as if fully set forth herein.

199.    Neither Mr. Triplett nor Triplett Contracting disclosed nor even mentioned to EFM the 2/23/22 Assignment until a letter dated December 13, 2022 purportedly confirming the 2/23/22 Assignment brought it to EFM's attention (the "12/13/22 Notice of Assignment"). A true and correct copy of the 12/13/22 Notice of Assignment is attached hereto as **Exhibit 13** and is incorporated by reference as if fully set forth herein.

200.    The 12/13/22 Notice of Assignment was delivered electronically to EFM's "sales" email address from the Factor on or about December 14, 2022. Upon receipt thereof, EFM contacted Mr. Triplett, who informed EFM that EFM should not submit payment due and owing (if any) to the Factor because Triplett had secured funds from another entity.

201.    Although EFM is unable to determine the veracity of the Factor's claims as against Triplett's (in other words, to whom undisputed sums under the Agreement should be paid), the *amounts* claimed by the Factor and Triplett Contracting represent amounts remaining in dispute as of the date of this Complaint pursuant to the terms of the Agreement.

202.    However, EFM would *not* have engaged Triplett Contracting as one (1) of its facility manager suppliers in the first place if Mr. Triplett or Triplett Contracting had disclosed to EFM the 2/23/22 Assignment, Triplett Contracting's previous financial troubles and/or insolvency, and/or Triplett Contracting's continued inability to pay its debts as they become due.

203.    As a result of Triplett's conduct as aforesaid, EFM terminated the Agreement *entirely* pursuant to Section 5 of each of the Service Agreements effective immediately as of

January 27, 2023 for, *inter alia*, the following reasons: (a) closure of at least two (2) Carvana Locations; (b) non-performance of services in connection with the Carvana Locations; (c) repeated complaints by Carvana and EFM without effective resolution; (d) dishonesty; and (e) violation of EFM's Code of Conduct.

204.    At present, EFM estimates Triplett's conduct as aforesaid has resulted in damages consisting of, *inter alia*, (a) payments by EFM previously made to Triplett Contracting in the approximate amount of One Hundred Thirty Two Thousand Six Hundred Forty Four Dollars and Twenty Two Cents ($132,644.22); (b) pre-launch preparation charges advanced to Triplett Contracting in the approximate amount of Thirteen Thousand One Hundred Sixty Five Thousand Dollars and Sixty Four Cents ($13,165.64); (c) lost revenue in the approximate amount of One Million Six Hundred Eighty Eight Thousand Three Hundred Ninety Nine Dollars and Nineteen Cents ($1,688,399.19); (d) emergency measures to secure replacement services in the approximate amount of Fifteen Thousand Eight Hundred Sixty Eight Dollars and Six Cents ($15,868.06); and (e) services rendered by replacement service providers in the approximate amount of Two Hundred Seventy Five Thousand Sixty Hundred Sixty Seven Dollars and No Cents ($275,667.00).

### COUNT I
**(Breach of Contract)**
**(EFM v. Triplett Contracting)**

205.    The foregoing paragraphs are hereby incorporated by reference as if set forth herein in full.

206.    The Agreement, as defined herein above and entered into as aforesaid, is a valid and enforceable contract, comprised, in part, of separate valid and enforceable contracts, by and between EFM and Triplett Contracting that is/are governed by New York law.

207.    Mr. Triplett, on behalf of Triplett Contracting, entered into the Agreement (and Mr. Triplett executed the separately valid and enforceable contracts collectively comprising the Agreement) for good and valuable consideration, including, but not limited to, the amounts and forms of payment set forth on each "Facility Details and Payment Information" page of each of the Service Agreements applicable to each respective Carvana Location.

208.    As aforesaid, Triplett materially breached the Agreement in numerous, repeated, and distinct ways, each of which will be proven at trial.

209.    For example, Triplett Contracting, *inter alia*, (a) failed to stage necessary equipment at certain ICs and other Carvana Locations after being ordered and subsequently repeatedly notified of its obligations to comply with said orders regarding same on November 30, 2022, December 16, 2022, and December 24, 2022; (b) failed to obtain the performance bond ordered by EFM and subsequently notified of its obligation to comply with said order on December 8, 2022, December 16, 2022, and December 24, 2022; (c) failed to perform the required snow removal services at the ICs and other Carvana Locations; (d) acted in a manner that led to both Triplett Contracting and EFM receiving numerous and repeated complaints by Carvana without effective resolution; (e) acted in a manner that caused certain ICs and Carvana Locations being shut down for periods of time.

210.    Additionally, as aforesaid, on or about December 24, 2022, Mr. Triplett, on behalf of Triplett Contracting, sent an email to EFM cancelling all further dispatches and services at ***all*** of the Carvana Locations; in other words, purporting to terminate the Agreement entirely, effective immediately, without cause or justification in a manner not contemplated by the Agreement, and contrary to expressed provisions of the Agreement.

211.    The aforesaid, in and of itself, constitutes additional separate and distinct material breaches of the Agreement.  *See, e.g.*, Seasonal Service Agreement § 4.

212.    Furthermore, under the Agreement (including, but not limited to, the Terms & Conditions), and in its role as one (1) of EFM's facility management suppliers, Triplett became privy to EFM's Confidential Information.

213.    Pursuant to Section P of the Terms & Conditions, upon the termination of the Agreement, Triplett became obligated, upon request from EFM, to immediately deliver to EFM "(i) any and all materials provided by Service Provider, relating in any way to and/or created in connection with the performance of the Services under the terms of the Agreement; and (ii) any and all originals, copied, reproductions and summaries of any Confidential Information …." *See* Partner Portal, Terms & Conditions § P.  Further, EFM "agree[d] to utilize the Confidential Information received by it only for the purpose of providing the Services and for no other purpose whatsoever including, but not limited to, diverting, inducing or attempting to divert or induce Client to discontinue or modify the present or future relationship between EFM and Client or otherwise injuring or interfering in the business relationship between EFM and Client." *Id.*

214.    "Confidential Information," as used therein, "means any information of EFM or Client that is not generally known to the public and at the time of disclosure if identified, or would reasonable be understood by [Triplett Contracting], to be proprietary or confidential, whether disclosed in oral, written, visual, electronic, or other form, and which [Triplett Contracting] (or its subcontractors or agents) observes or learns in connection with th[e] Agreement." *See* Partner Portal, Definitions, at ¶ 6.

215.    "Confidential Information" includes, but is not limited to: "(a) business plans, strategies, forecasts, projects and analyses; (b) financial information and fee structures; (c)

business processes, methods and models; (d) employee and supplier information; (e) materials, product and service specifications; (f) manufacturing, purchasing, logistics, sales and marketing information; and (g) the terms and conditions of this Agreement.  Confidential Information also includes Personal Information and Client Data." *See id.*

216.    As aforesaid, on or about December 24, 2022, EFM terminated the Seasonal Service Agreement applicable to the Trenton IC after its previous notices to Triplett Contracting outlining Triplett Contracting's material contract deficiencies as of said date had not been cured within the time provided for under the Agreement, and, regardless, because Triplett Contracting's conduct, as aforesaid, permitted the Agreement to be terminated by EFM immediately.  *See, e.g.,* Seasonal Service Agreement § 5.

217.    Nonetheless, Triplett has and continues to harass and threaten Carvana and its personnel about payment of certain sums that Triplett claims EFM owes Triplett Contracting, which necessarily requires that Triplett use EFM's Confidential Information in connection therewith.

218.    Triplett's threatening and harassing conduct directed towards EFM's clients has caused, and continues to cause, immediate and irreparable harm to EFM's brand and reputation and is interfering and continues to interfere (and, indeed, has already materially interfered) with EFM's current and prospective business operations with Carvana.

219.    Accordingly, on or about January 4, 2023, EFM demanded through written correspondence that Triplett immediately cease and desist from contacting Carvana and, by no later than January 5, 2023 at 5:00 p.m. EST: (i) confirm in writing that Triplett will immediately cease and desist from directly contacting any of EFM's customers; and (ii) provide EFM with a list of any and all of EFM's customers, suppliers, distributors, investors, vendors, consultants,

and/or independent contractors with which Triplett has had written or verbal contact since October 1, 2022.

220.    Triplett failed to comply with the aforesaid demand by the aforesaid deadline.

221.    Furthermore, as aforesaid, on or about January 27, 2022, EFM terminated the Agreement in its entirety for substantially the same reasons that EFM terminated the Trenton IC Service Agreement on or about December 24, 2022.

222.    And, on or about January 27, 2022, in connection therewith, EFM renewed the demands that it had previously made on or about January 4, 2023 to Triplett, in addition to asserting additional demands.

223.    However, Triplett again failed to comply with EFM's demands as aforesaid.

224.    Furthermore, pursuant to Section P.2 of the Terms & Conditions, Triplett Contracting "irrevocably agree[d] that irreparable damage to EFM would occur in the event that it breaches any of the provisions of … Section P (*Confidential Information*)."  *See* Partner Portal, Terms & Conditions § P.4 (emphasis in original).  Triplett Contracting also "acknowledge[d] and agree[d] that EFM shall be entitled to an injunction or injunctions to prevent breaches of … Section P, in addition to any other remedy to which EFM is entitled at law or in equity."  *Id.*

225.    In fact, in the above-referenced circumstance, Triplett Contracting agreed not to allege, and agreed to waive, the defense that there is an adequate remedy at law.  *Id.*

226.    Thus, with respect to those certain material breaches of the Agreement by Triplett Contracting, as aforesaid, which required that EFM provide Triplett Contracting with adequate notice of, and an opportunity to cure, said material breaches under the Agreement, Triplett Contracting was provided such notice as required by the Agreement but failed to cure such violations thereunder as required by the Agreement.

227.    Alternatively, with respect to certain other material breaches of the Agreement by Triplett Contracting, as aforesaid, Triplett Contracting was not entitled to an opportunity to cure said material breaches under the Agreement.

228.    In either case, EFM fully performed under the Agreement, as aforesaid, and properly exhausted any and all prerequisites to enforcing its contractual rights against Triplett in this Action that seeks permanent relief and specific performance under the Agreement.

229.    Triplett's material breaches of the Agreement, as aforesaid, have caused, and unless the Court permanently restrains Triplett's ongoing damaging conduct, including, but not limited to, making misleading statements and harassing threats to EFM's customers and suppliers, including, but not limited to Carvana, and compels Triplett to perform under the Agreement by returning Confidential Information as aforesaid, will continue to cause, EFM immediate and irreparable harm for which EFM has no adequate remedy at law.

230.    Furthermore, as set forth above, prior to the Agreement being terminated by EFM on January 27, 2023, Triplett materially breached the Agreement in numerous, separate and distinct ways, which caused and will continue to cause EFM to sustain monetary damages in excess of Seventy Five Thousand Dollars ($75,000) and in an amount to be fully determined at trial.

231.    Mr. Triplett's and Triplett Contracting's conduct has been willful, outrageous, undertaken with reckless indifference to EFM's rights, in bad faith, and with the intent to harm EFM for its/their own competitive advantage.

**<u>COUNT II</u>**
**(Unjust Enrichment)**
**(In the Alternative to Count I)**
**(EFM v. Triplett Contracting)**

232.    The foregoing paragraphs are hereby incorporated by reference as if set forth herein in full.

233.     As a result of Triplett Contracting's conduct, as aforesaid, benefits were conferred upon Triplett Contracting by EFM.

234.     Specifically, Triplett Contracting invoiced EFM in the amount of One Hundred Thirty Three Thousand Six Hundred and Forty Four Dollars and Twenty Two Cents ($133,644.22) for services rendered and invoiced in November 2022.

235.     On or about December 1, 2022, in advance of when payment from EFM to Triplett Contracting would otherwise have been payable pursuant to the Agreement, EFM remitted payment to Triplett Contracting in the amount of Fifty Four Thousand Fifty Two Dollars and Forty Two Cents ($54,052.42) specifically to ensure that Triplett Contracting would have the requisite funds to secure required equipment and materials.

236.     And, on or about December 27, 2022, EFM remitted payment to Triplett Contracting in the remaining amount of Seventy Nine Thousand Five Hundred Ninety One Dollars and Eighty Cents ($79,591.80) pursuant to the Agreement's "Net 30 Terms." *See, e.g.*, Partner Portal, Exhibit 4 (Service Provider Invoicing Instructions), p. 2 ("Net 30 Terms").

237.     By way of further example, EFM's Managing Director of Operations, Assistant Director of Operations, and administrative/operational support personnel, traveled from Arizona to New Jersey, Indianapolis, Oklahoma, and Ohio, to assist Triplett Contracting with certain site visits to ensure Triplett Contracting was able to provide consistent and quality snow removal services to certain of the Carvana Locations.

238.     EFM incurred approximately Thirteen Thousand One Hundred Sixty Five Dollars and Sixty Four Cents ($13,165.64) in costs, expenses, and work hours attributed to the above-referenced site visits.

239.   As a result of Triplett Contracting's above-referenced conduct, and as otherwise detailed herein above and throughout this Complaint, Triplett Contracting appreciated the benefits of EFM's conduct.

240.   As a result of Triplett Contracting's conduct, as detailed herein above and throughout this Complaint, it would be inequitable to permit Triplett Contracting to retain said benefits without payment of value to EFM (or the return of payment to EFM for services invoiced by Triplett Contracting but not performed by Triplett Contracting in November 2022).

241.   EFM seeks substantial damages, the precise amount of which will be determined at trial.

242.   Triplett Contracting's conduct has been willful, outrageous, undertaken with reckless indifference to EFM's rights, in bad faith, and with the intent to harm EFM for its/their own competitive advantage.

**COUNT III**
**(Fraud In The Inducement)**
**(EFM v. All Defendants)**

243.   The foregoing paragraphs are hereby incorporated by reference as if set forth herein in full.

244.   As aforesaid, Mr. Triplett, on behalf of Triplett Contracting, intentionally made material misrepresentations of fact, and/or intentionally concealed and/or failed to disclose material facts, relating to, *inter alia*, Triplett's ability to perform consistent and quality snow removal services with its own primary and in-house crews on behalf of EFM in connection with EFM's client accounts.  *See, e.g.,* 7/5/22 Email; *see also* 9/7/22 Email.

245.   As aforesaid, Mr. Triplett, on behalf of Triplett Contracting, also intentionally made material misrepresentations of fact as set forth in, *inter alia*, Section G of the Terms & Conditions.

*See, e.g.*, Terms & Conditions §§ G.6, G.9, G.12.  *See also id.* at §§ H.1, H.2, H.3, H.4, J.1, J.4, K, N.8.

246.    As aforesaid, Mr. Triplett, on behalf of Triplett Contracting, also intentionally concealed the 2/23/22 Assignment (and Triplett Contracting's financial instability and/or insolvency) at the time Triplett Contracting sought to become one (1) of EFM's facility management suppliers, and again when bidding on the ability to service (through EFM) the Carvana Locations.

247.    Mr. Triplett, as the Chief Executive Officer of Triplett Contracting, and Triplett Contracting, as the entity with whom EFM ultimately entered into the Agreement, each knew that Triplett Contracting was unable to provide consistent and quality snow removal services with its own primary and in-house crews in connection with the Agreement, prior to entering into the Agreement.

248.    Further, Mr. Triplett, as the Chief Executive Officer of Triplett Contracting, and Triplett Contracting, as the entity with whom EFM ultimately entered into the Agreement, each knew that Triplett Contracting was not adequately solvent enough to perform its obligations under the Agreement, prior to entering into the Agreement.

249.    Mr. Triplett and Triplett Contracting knew that some or all of Triplett Contracting's primary crews and in-house technicians were neither sufficient in number nor competency to perform snow removal services under the Agreement as required.

250.    Mr. Triplett and Triplett Contracting knew that some or all of Triplett Contracting's secondary crews and technicians with whom it subcontracts work orders were neither sufficient in number nor competency to perform snow removal services under the Agreement as required.

251.    Mr. Triplett and Triplett Contracting knew that Triplett Contracting was unable to operate as a solvent going concern.

252.    Mr. Triplett and Triplett Contracting knew that the aforesaid intentionally made misrepresentations of fact, and/or intentionally omitted facts, were relevant and material to the negotiations and decisions regarding (a) EFM engaging Triplett as one of its facility management suppliers; and (b) EFM awarding Triplett the ability to service EFM's Carvana account on behalf of EFM, because the foregoing, *inter alia*, was expressed to Triplett by EFM during the time at which Triplett was requesting to become one of EFM's facility management suppliers and were the expressed purpose for which the Award Letter required site-visits and a performance bond as conditions precedent to entering into the Service Agreements.

253.    But for Mr. Triplett's and Triplett Contracting's material misrepresentations and omissions, as aforesaid, as Mr. Triplett and Triplett Contracting knew that EFM would neither have (a) engaged Triplett as one of its facility management suppliers; nor (b) permitted Triplett to service EFM's Carvana account on behalf of EFM.

254.    Because Mr. Triplett and Triplett Contracting provided false and misleading information to EFM in the context of the foregoing, Mr. Triplett and Triplett Contracting each, respectively, knew that EFM would justifiably rely on the aforesaid misrepresentations and omissions of material information relating to the ability of Triplett Contracting to perform services under, and remain solvent throughout, the Agreement.

255.    Stated differently, Mr. Triplett and Triplett Contracting made the above-referenced and aforesaid representations and omissions of material information with the intention of inducing EFM's reliance thereon with knowledge that the aforesaid representations and omissions were false.

256.    EFM reasonably and justifiably relied upon the material misrepresentations and omissions by Mr. Triplett and Triplett Contracting as aforesaid.

257.    Had EFM been aware of Triplett Contracting's true ability (or, more accurately, inability) to perform the services as required by the Agreement, EFM would not have entered into the Agreement, which resulted in damages comprised of wasted payments being made by EFM to Triplett, pre-launch preparation charges, lost revenue, emergency measures to secure replacement service provides, and paying replacement service providers for services rendered, all as aforesaid.

258.    Had EFM been aware of Triplett Contracting's true financial condition as aforesaid, which is evidenced by, *inter alia*, the 2/23/22 Assignment, EFM would not have entered into the Agreement with Triplett Contracting.

259.    As a result of EFM's reliance on false statements made by Mr. Triplett and Triplett Contracting, and/or Mr. Triplett's and Triplett Contracting's intentionally made decisions not to disclose such material information as aforesaid, EFM has suffered damages, the precise amount of which will be determined at trial.

260.    Mr. Triplett's and Triplett Contracting's conduct has been willful, outrageous, undertaken with reckless indifference to EFM's rights, in bad faith, and with the intent to harm EFM for its/their own competitive advantage.

## <u>COUNT IV</u>
### (Tortious Interference with Business Relations and Prospective Economic Advantage)
### (EFM v. All Defendants)

261.    The foregoing paragraphs are hereby incorporated by reference as if set forth herein in full.

262.    At all times relevant to this Action, including, but not limited to, before and after the Agreement was executed, EFM had a business relationship with Carvana, a third party.

263.    As aforesaid, Mr. Triplett and Triplett Contracting knew of the business relationship between EFM and Carvana.

264.    As aforesaid, Mr. Triplett, individually and on behalf of Triplett Contracting, acted solely out of malice, or used dishonest, unfair, and improper means to interfere with and cause injury to EFM's relationship with Carvana.

265.    Mr. Triplett's conduct, individually and on behalf of Triplett Contracting, as aforesaid, was directed to Carvana—the party with whom EFM has and seeks to continue to have a relationship—as opposed to EFM alone; and in particular, but not by way of limitation, pertained to EFM's prospect of entering into a subsequent snow and ice removal contract with Carvana to perform snow and ice removal services on behalf of Carvana during the upcoming 2023-2024 winter season.

266.    Mr. Triplett's conduct, individually and on behalf of Triplett Contracting, as aforesaid, included, *inter alia*, making fraudulent and/or tortious misrepresentations to Carvana, including, but not limited to, harassing threats of meritless litigation, and/or wrongful economic pressure.

267.    Specifically, as a result of Triplett Contracting's conduct, as aforesaid, Mr. Triplett, on behalf of Triplett Contracting, has been harassing (and continue to harass) and threatening (and continue to threaten) Carvana regarding the payment of funds that Mr. Triplett, on behalf of Triplett Contracting, claims EFM owed (and owes) Triplett Contracting.

268.    However, the claims that Mr. Triplett made to Carvana were unfounded.

269.    Mr. Triplett and Triplett Contracting knew the above-referenced claims were unfounded because certain payments had been remitted at the time Mr. Triplett's statements were made.

270.    Or, such other amounts about which Mr. Triplett and Triplett Contracting contacted Carvana were not due and owing.

271.    Thus, the demands made by Mr. Triplett, on behalf of Triplett Contracting, to Carvana, were misleading and constituted material misrepresentations.

272.    For example, on or about December 28, 2022, Mr. Triplett, individually and on behalf of Triplett Contracting, misrepresented to Carvana that it was seeking "Owed Funds" of Two Hundred Twelve Thousand Ninety Five Dollars and Ninety Five Cents ($212,095.95) *payable as of December 28, 2022*.

273.    However, setting aside whether any portion or all of the foregoing amount represented sums that were properly disputed by EFM per the terms of the Agreement, EFM "pays for services rendered, which means only after the service has been performed, so in the case of recurring contract, the service is not considered complete until the final day of the period of performance, and that would be the final day of the month."  *See, e.g.*, Partner Portal, Exhibit 4 (Service Provider Invoicing Instructions), p. 2 (discussing "Net 30 Terms").

274.    So, any "Owed Funds" for services invoiced during the month of November 2022 would not be posted until November 30, 2022 (*i.e.*, the final day of the month), and payment associated therewith would not be due from EFM until December 30, 2022 (again, assuming *arguendo* that such amounts were undisputed).  *See, e.g. id.*

275.    Triplett was aware of the above-referenced provisions of the Agreement, but out of spite, contacted Carvana directly, despite the terms of the Agreement, to harass Carvana solely out of malice, using dishonest, unfair, and improper means, to interfere with and cause injury to EFM's relationship with Carvana.

276.    Further, when Mr. Triplett, individually and on behalf of Triplett Contracting, told Carvana (on or about December 28, 2022 as well) that additional sums "will be due on the 1st of January" for services Triplett claimed to have rendered during December 2022, Mr. Triplett and Triplett Contracting knew these statements were false and misleading.

277.    In addition to the aforesaid examples, Mr. Triplett, on behalf of Triplett Contracting, represented to Carvana that it was owed money for amounts that had previously, formally been disputed by EFM, knowing that such amounts had been previously, formally disputed by EFM under the Agreement.

278.    Finally, in connection with disputed sums invoiced by Triplett Contracting during the month of December 2022, which were, at the latest, formally disputed by EFM as of January 27, 2023, Mr. Triplett, individually and on behalf of Triplett Contracting, threatened to report EFM and Carvana to, *inter alia*, attorneys general offices, departments of labor, and other regulatory offices and agencies of states in which Triplett Contracting performed services under the Agreement, despite the Agreement's payment terms.

279.    Specifically, on February 12, 2023, Mr. Triplett, on behalf of Triplett Contracting, threatened to make "72 different complaint for Carvana for all events that transpired during [Triplett Contracting's] servicing with EFM, as well as a 20 page report that [Mr. Triplett] personally prepped, along with 32 exhibits of supporting evidence that will be submitted to all of these agencies for review and investigating."  A true and correct copy of said email (the "2/12/23 Email") is attached hereto as **<u>Exhibit 14</u>** and is incorporated by reference as if fully set forth herein.

280.    None of the threatened reports have any basis or justification in law or fact; nor has payment been withheld by Carvana in a manner not contemplated by the Agreement between EFM and Triplett Contracting.

281.    Mr. Triplett and Triplett Contracting are aware of the payment terms set forth in the Agreement, and are knowingly choosing not to abide by them.

282.    In similar vein, on or about December 28, 2022, Mr. Triplett, individually and on behalf of Triplett Contracting, as well as Triplett Contracting's counsel, have made threats to file liens or otherwise encumber certain of the Carvana Locations.

283.    The aforesaid threats were vexatious, undertaken in bad faith, and for in improper and fraudulent purpose because (a) there is no factual or legal basis for the threatened filings; and (b) the threatened filings are expressly prohibited by Section 3 of the Terms & Conditions.  *See* Terms and Conditions § H.3 ("Service Provider acknowledges that neither EFM nor the Client intend for the Services to constitute "improvements" or meet any similar definition that lends itself to ownership rights of Service Provider or otherwise enables Service Provider to avail itself of any lien statutes.  Service Provider shall not file nor permit any person or entity acting for or under Service Provider to file any liens against EFM, the buildings or the Facilities on which the Services are to be performed….").

284.    Given that all of Mr. Triplett's and Triplett's Contracting's conduct, as aforesaid, is expressly contradicted by the terms of the Agreement, Mr. Triplett's and Triplett Contracting's conduct has been undertaken for no other purpose than to intentionally inflict harm upon EFM.

285.    On or about December 29, 2022, Carvana requested that EFM outline a plan to deal with Triplett so as to ensure that no liens are filed in connection with any of the Carvana Locations.  A true and correct copy of said December 29, 2022 email (the "12/29/22 Email") is attached hereto as **Exhibit 15** and is incorporated by reference as if fully set forth herein.

286.    Mr. Triplett's and Triplett's Contracting's conduct, as aforesaid, encompass conduct broader than mere acts of contractual discretion.

287.     But for Mr. Triplett's and Triplett's Contracting's conduct, as aforesaid, upon information and belief, EFM would be providing snow removal services on behalf of Carvana at the Carvana Locations in connection with the 2023-2024 winter season.

288.     Mr. Triplett's and Triplett's Contracting's conduct, as aforesaid, upon information and belief, is the direct and proximate cause of Carvana not engaging EFM to provide snow removal services on its behalf at the Carvana Locations in connection with the 2023-2024 winter season.

289.     Based upon the foregoing, EFM has been damaged with respect to its reputation and goodwill, and in a monetary amount, that will be fully determined at trial.

**WHEREFORE**, Plaintiff, FMG Express Facility Management Group LLC, respectfully requests that this Honorable Court enter judgment in its favor against Defendants, Triplett Contracting LLC and Timour Triplett, in connection with each of the foregoing causes of action, and Order the following relief:

A.     That Defendants, and all other persons or entities acting in active concert or participation with Defendants, be permanently enjoined and restrained from violating the Agreement, including, but not limited to, Section P of the Terms & Conditions, by, *inter alia*, possessing, using, copying, and/or disclosing any Confidential Information belonging to Plaintiff in a manner not contemplated by the Agreement, including to harass and threaten Plaintiff's customers for payment of disputed sums;

B.     That Defendants be specifically required to perform under the Agreement, including Section P of the Terms and Conditions by, *inter alia*, returning the requested Confidential Information to Plaintiff, as previously demanded;

C.      That Defendants be compelled, at their own cost and expense, to account for all of Plaintiff's Confidential Information in their possession, custody, and control, to have it returned to Plaintiff or destroyed, by having its current and former employees' electronic devices, including any and all computers and cellphones, which were, *inter alia*, used to receive Confidential Information from Plaintiff from the time Mr. Triplett, on behalf of Triplett Contracting, first engaged Plaintiff on or about July 5, 2022 to the present, be forensically examined by an independent third party approved by Plaintiff to confirm that Defendants are no longer using any of Plaintiff's Confidential Information contrary to provisions of the Agreement;

D.      That Defendants be required to return to Plaintiff the approximate amount of One Hundred Thirty Two Thousand Six Hundred Forty Four Dollars and Twenty Two Cents ($132,644.22), as more fully and exactly determined at trial, in connection with payments that were made by Plaintiff to Defendants, *inter alia*, on or about December 1, 2022 and December 27, 2022, respectively;

E.      That Defendants be required to pay Plaintiff the approximate amount of Thirteen Thousand One Hundred Sixty Five Dollars and Sixty Four Cents ($13,165.64), as more fully and exactly determined at trial, in connection with pre-launch preparation charges incurred by Plaintiff, as aforesaid;

F.      That Defendants be required to pay Plaintiff the approximate amount of One Million Six Hundred Eighty Eight Thousand Three Hundred Ninety Nine Dollars and Nineteen Cents ($1,688,399.19), as more fully and exactly determined at trial, which is attributed to Plaintiff's lost revenue, as aforesaid;

G.      That Defendants be required to pay Plaintiff the approximate amount of Fifteen Thousand Eight Hundred Sixty Eight Dollars and Six Cents ($15,868.06), as more fully and

exactly determined at trial, which is attributed to emergency measures taken by Plaintiff to secure replacement services, as aforesaid;

     H.     That Defendants be required to pay Plaintiff the approximate amount of Two Hundred Seventy Five Thousand Sixty Hundred Sixty Seven Dollars and No Cents ($275,667.00), as more fully and exactly determined at trial, which is attributed to Plaintiff's payment to said replacement service providers for services rendered, as aforesaid;

     I.     That Defendants be required to disgorge all payments and benefits, including, but not limited to, revenues and profits, which it received from Plaintiff under the Agreement while engaging in the wrongful and fraudulent conduct, as aforesaid;

     J.     That Plaintiff be awarded actual, compensatory, consequential and punitive/exemplary damages, pre-judgment and post-judgment interest, reasonable attorney's fees, costs, and expenses for Defendant's separate and distinct material breaches of the Agreement, as well as for Defendant's intentionally tortious conduct;

     K.     That Plaintiff be awarded actual, compensatory, consequential and punitive/exemplary damages, pre-judgment and post-judgment interest, reasonable attorney's fees, costs, and expenses, pursuant to any other statutory or common law or rule;

     L.     That Defendants be held jointly and severally liable where allowed by law; and

     M.     That Plaintiff be awarded such other and further necessary and proper relief as this Court may deem just and proper.

Respectfully submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Dated: March 14, 2023

By: */s/ Barry L. Cohen*
Barry L. Cohen (4746624)
Matthew Faranda-Diedrich (*Pro Hac Vice application forthcoming*)
David S. Hollander *(Pro Hac Vice application forthcoming)*
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
T: 212.389.5947
F: 484.362.2630
Email: bcohen@rccblaw.com
       mfd@rccblaw.com
       dhollander@rccblaw.com

*Attorneys for Plaintiff FMG Express Facility Management Group LLC*